**Pennsylvania National Mutual
Insurance Company v. Drozdowski**

6

*Kenneth M. Portner,* for plaintiff.
*Joseph P. Birmingham,* for defendant.

JOHNSON, *J.,* October 28, 2005—Before the court is the plaintiff Pennsylvania National Mutual Casualty Insurance Company's insurance coverage action in which Penn National seeks a declaration that it does not owe coverage to Edward M. Drozdowski II under a Personal Auto insurance policy (PNI policy) issued to Peter Sukeena (owner) for claims asserted against Drozdowski in lawsuits brought by Sharon Hanna and Standard Fire Insurance Company arising out of an automobile accident occurring on July 13, 2002. Counsel filed a set of stipulated facts and trial memoranda pursuant to this court's September 30, 2005 order. Argument was held on this matter on October 19, 2005.

Penn National argues that because Drozdowski did not have permission from the owner to operate the vehicle, Penn National has no duty to indemnify Drozdowski for any award entered against him in the lawsuits arising out of the accident. Defendant Standard Fire Insurance Company argues conversely that the law presumes that the driver of an automobile operates that motor vehicle with the permission of the owner, and that, by lending his vehicle to his son, Stephen Sukeena, the owner gave his implied permission for Drozdowski to operate said vehicle. For the reasons that follow, the court finds that Penn National has no duty to indemnify Drozdowski

under the PNI policy for claims asserted against him in the underlying lawsuits.

## 1. STIPULATED FACTS

(1) This is a declaratory judgment action in which Penn National seeks a declaration that it does not provide coverage for Edward Drozdowski and the unidentified driver of a vehicle owned by Peter Sukeena which was involved in an accident with a vehicle occupied by Sharon, Joseph and Pauline Hanna on July 16, 2002, in White Hall Township, Pennsylvania.

(2) On July 13, 2002, Sharon Hanna, Joseph Hanna, Pauline Hanna and Charlene Trumbauer were driving in a vehicle owned by Joseph and Pauline Hanna eastbound on Huckleberry Road in Whitehall Township, Pennsylvania. (Deposition of Sharon Hanna, February 21, 2005 at 17-18.)

(3) As the Hanna vehicle came to the intersection of Huckleberry Road and Ridgeview Drive, it slowed to stop for a stop sign. (Deposition of Sharon Hanna, February 21, 2005 at 17-18.)

(4) As the Hanna vehicle was slowing to stop at the stop sign, a silver Acura sedan passed through the intersection from northbound Ridgeview Drive onto westbound Huckleberry Road without stopping at the posted stop sign on Ridgeview Drive. (Deposition of Sharon Hanna, February 21, 2005 at 17-18, 19.)

(5) In executing this turn, the Acura crossed from the westbound lane of Huckleberry Road into the eastbound lane of Huckleberry Road, striking the Hanna vehicle. (Deposition of Sharon Hanna, February 21, 2005 at 17-18.)

(6) The accident occurred shortly before 7 p.m. on July 13, 2002.

(7) Sharon Hanna testified that she saw two people in the silver Acura. One was an African-American male, the second was a white male. (Deposition of Sharon Hanna, February 21, 2005 at 24-25.) She testified that at the time of the accident the silver Acura was being driven by the African-American. (Deposition of Sharon Hanna, February 21, 2005 at 24.)

(8) Later on, Sharon Hanna identified the white male passenger of the silver Acura as Edward Drozdowski. (Deposition of Sharon Hanna, February 21, 2005 at 21-22.)

(9) After the impact, the silver Acura that struck the Hanna's vehicle left the scene without stopping. (Deposition of Sharon Hanna, February 21, 2005 at 20.)

(10) A witness to the accident saw and recorded the Acura's license plate number and gave it to the police. (Deposition of Sharon Hanna, February 21, 2005 at 32.)

(11) The police traced the license plate to a 2002 silver Acura RL owned by Peter Sukeena of 717 West Union Street, Whitehall, Pennsylvania. (Police accident report dated July 13, 2002.)

(12) Peter Sukeena is 77 years old. (Deposition of Peter Sukeena, January 25, 2005 at 6.) Peter is Stephen Sukeena's father. (Deposition of Peter Sukeena, January 25, 2005 at 7.) Stephen Sukeena is 42 years old. (Deposition of Peter Sukeena, January 25, 2005 at 7.)

(13) On July 12, 2002 Peter loaned his 2002 Acura to Stephen. (Deposition of Peter Sukeena, January 25, 2005 at 8.)

(14) On the night of July 12, 2002, Stephen drove in Peter's car to Edward Drozdowski's home at 1338 Gordon Street in Allentown, Pennsylvania. (Deposition of Stephen Sukeena, January 25, 2005 at 11.) There was a "get-together" at Drozdowski's home and there were some girls there that Stephen liked. (Deposition of Stephen Sukeena, January 25, 2005 at 11.)

(15) Drozdowski's home on Gordon Street in Allentown is 27 blocks west and 16 blocks north of Drozdowski's home at 14th and Gordon Streets in Allentown. (Deposition of Edward M. Drozdowski II, June 13, 2005 at 71.)

(16) Stephen stayed overnight in Drozdowski's home and woke up in the afternoon of Saturday, July 13, 2002. (Deposition of Stephen Sukeena, January 25, 2005 at 17.)

(17) Stephen testified that on the afternoon of July 13, 2002, he asked Drozdowski to go to the store to get him vodka and cigarettes and gave Drozdowski the keys to Peter's car. (Deposition of Stephen Sukeena, January 25, 2005 at 19, ll. 16-25, 20, ll. 1-9.)

(18) The State Store nearest to Drozdowski's home at the time was located at 1928 Allen Street in Allentown, about seven blocks from Drozdowski's home at 1338 Gordon Street. (Deposition of Edward Drozdowski, June 13, 2005 at 65-66.)

(19) Stephen's instructions to Drozdowski were to get the items and come right back. (Deposition of Stephen Sukeena, January 25, 2005 at 30, ll. 2-5.) To Stephen at least, it was clear that Drozdowski was not supposed to let anyone else drive the car. (Deposition of Stephen Sukeena, January 25, 2005 at 30, ll. 6-10.)

(20) Stephen testified that he could not think of anything that he had said or done which would lead Drozdowski to believe that it was ok for him to let someone else drive the car. (Deposition of Stephen Sukeena, January 25, 2005 at 68.)

(21) Drozdowski testified that he had never borrowed or used a car from Stephen prior to July 13, 2002. (Deposition of Edward M. Drozdowski II, June 13, 2005 at 18, ll. 7-15.)

(22) Stephen saw Drozdowski leave but did not see Drozdowski leave with anyone. (Deposition of Stephen Sukeena, January 25, 2005 at 20, ll. 7-8.) Stephen saw Drozdowski back in Drozdowski's home on the evening of July 13, 2002. (Deposition of Stephen Sukeena, January 25, 2005 at 22, ll. 11-17.)

(23) Drozdowski had been gone for several hours before Stephen discovered he was back. (Deposition of Stephen Sukeena, January 25, 2005 at 64, ll. 4-8.) Stephen was angry because Drozdowski was supposed to have gotten the items and come right back. (Deposition of Stephen Sukeena, January 25, 2005 at 64, ll. 18-25, 65, ll. 1-21.)

(24) Stephen testified that Drozdowski told him that he had returned from the errand, left the keys to the car on the refrigerator, and then left to go to a bar. (Deposition of Stephen Sukeena, January 25, 2005 at 66, ll. 11-18.)

(25) When Stephen went to leave Drozdowski's home at around 11 p.m. on Saturday, July 13, 2002, he discovered that his father's car had been damaged. (Deposition of Stephen Sukeena, January 25, 2005 at 21-22.) Stephen returned to Drozdowski's home to ask him what had hap-

pened to the car and Drozdowski told him the damage must have occurred while it was parked. (Deposition of Stephen Sukeena, January 25, 2005 at 23, ll. 13-18.)

(26) Drozdowski testified that in the early afternoon of July 13, 2005, Stephen asked him to go to the store to get cigarettes and beer and gave him the keys to the car. (Deposition of Edward M. Drozdowski II, June 13, 2005, at 18, ll. 7-15.)

(27) Drozdowski testified that he took the keys, left in the car to go the store, Woody's at 12th and Liberty Streets in Allentown, and returned in 20 minutes. (Deposition of Edward M. Drozdowski II, June 13, 2005 at 20, ll. 10-19.) Drozdowski testified that Stephen asked him to go out a second time later that day to get more beer and that he believes he used the car a second time to do this. (Deposition of Edward M. Drozdowski II, June 13, 2005, at 20 ll. 19-25.) Drozdowski stated that after each time when he returned he gave the keys back to Stephen. (Deposition of Edward M. Drozdowski II, June 13, 2005 at 20, ll. 23-25.)

(28) Drozdowski indicated that he returned the keys to Stephen the second time at approximately 5 p.m. on July 13, 2002, and left his house to go to a bar with some friends. (Deposition of Edward M. Drozdowski II, June 13, 2005 at 21-22.) He returned to his home from the bar and when Stephen left his house at around midnight on July 13, he could not find the car keys. The keys were discovered on top of the refrigerator. (Deposition of Edward M. Drozdowski II, June 13, 2005 at 23, ll. 8-15.)

(29) Drozdowski testified that he was not in the Acura at the time of the accident with the Hanna vehicle and that he did not give the keys to the vehicle to anyone else

in the course of that day. (Deposition of Edward M. Drozdowski II, June 13, 2005 at 43-44.)

(30) Stephen did not own a car. (Deposition of Peter Sukeena, January 25, 2005 at 8.) Accordingly, it was normal for Peter to loan Stephen his car. (Deposition of Peter Sukeena, January 25, 2005 at 9.) However, Stephen did not have his own set of keys for the car and had to ask Peter for the keys when he wanted to use it. (Deposition of Peter Sukeena, January 25, 2005 at 52, ll. 8-17.)

(31) Peter did not give Stephen any instructions as to who was permitted to drive the Acura when Stephen took the car on July 12, 2002, (Deposition of Peter Sukeena, January 25, 2005 at 13), and before July 12, 2002, Peter had never had any discussions with Stephen about who was allowed to drive Peter's car. (Deposition of Peter Sukeena, January 25, 2005 at 14.) However, Peter testified that he did not know that his son was letting other people drive his car and that it was not ok with him if his son let other people drive his car. (Deposition of Peter Sukeena, January 25, 2005 at 25, ll. 7-16.) Peter had never heard of or met Edward Drozdowski before the July 13, 2002 accident. (Deposition of Peter Sukeena, January 25, 2005 at 17-18.)

(32) Peter recalled that he had lent his car to Stephen on the evening of July 12, 2002, a Friday. Peter did not see the car again until Sunday, July 14, 2002, when the police came to see him because the car had been reported to have been involved in the July 13, 2002 accident with the Hanna vehicle.

(33) Stephen testified that he had never let Drozdowski or anyone else borrow Peter's car before July 13, 2002.

(Deposition of Stephen Sukeena, January 25, 2005 at 24, ll. 13-19.)

(34) In 2004, Sharon Hanna and Standard Fire Insurance Company (as subrogee of Joseph and Pauline Hanna) brought lawsuits against Peter Sukeena, Stephen Sukeena and Edward Drozdowski for damages allegedly arising from the July 13, 2002 accident.

(35) The Hanna and Standard Fire lawsuits allege that Drozdowski was liable because he negligently entrusted the vehicle to the driver.

(36) Pennsylvania National issued a Personal Auto Policy of insurance, policy number *** *******, to Peter Sukeena (the PNI policy). The PNI policy had effective dates of February 11, 2002 to August 11, 2002. (PNI policy attached as exhibit "A" not included herein.)

(37) The PNI policy lists Peter Sukeena as the "named insured." The 2002 Acura involved in the accident is a covered auto under the PNI policy.

(38) The insuring agreement of the PNI policy provides as follows:

"We will pay damages for 'bodily injury' or 'property damage' for which any 'insured' becomes legally responsible because of an auto accident." PNI policy, form 70-3408 (Rev. 06/99) Part A.—Liability coverage at 1.

(39) The PNI policy defines the term "insured," in pertinent part, as follows:

" 'Insured' as used in this part means:

"(1) You or any 'family member' for the ownership, maintenance or use of any auto or 'trailer.'

"(2) Any person using 'your covered auto.'" PNI policy, form PP 00 01 06 98, Part A.—Liability coverage at 2.

(40) The PNI policy defines "family member" as "a person related to you by blood, marriage or adoption who is a resident of your household." PNI policy, form PP 00 01 06 98 definitions F. at page 1.

(41) The PNI policy does not provide liability coverage for any "insured" "[u]sing a vehicle without permission of the owner." PNI policy, form 70-3408 (Rev. 06/99) Part A.—Liability coverage, exclusions A.8 at 1.

## 2. CONCLUSIONS OF LAW

(1) If the language of an insurance policy is unambiguous, the court must apply the policy as written. *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 305, 469 A.2d 563, 566 (1983).

(2) Pennsylvania law permits recovery under an insurance policy with a "non-permissive use" if it is possible to establish either express or implied permission to use the vehicle. *Nationwide Mutual Insurance Co. v. Cummings,* 438 Pa. Super. 586, 599, 652 A.2d 1338, 1344 (1994).

## 3. THE PENN NATIONAL POLICY

The interpretation of an insurance policy presents a question of law for the court. *Bowers v. Feathers,* 448 Pa. Super. 263, 268, 671 A.2d 695, 697 (1995). This requires the court to determine the parties' intent as manifested in the language of the policy. *Nationwide Insurance Co. v. Horace Mann Insurance,* 759 A.2d 9, 11 (Pa.

Super. 2000). If the language of the policy is unambiguous, the court must apply the policy as written. *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 305, 469 A.2d 563, 566 (1983). A policy is not ambiguous simply because the parties disagree on its meaning. *Williams v. Nationwide Mutual Insurance Co.,* 750 A.2d 881, 885 (Pa. Super. 2000).

The court finds that the PNI policy clearly and unambiguously provides that persons who are not directly insured under the PNI policy are not entitled to coverage when they use a vehicle covered under the policy without the owner's permission.

The policy's insuring agreement provides as follows:

"We will pay damages for 'bodily injury' or 'property damage' for which any 'insured' becomes legally responsible because of an auto accident." Penn National Policy, form 70-3408 (Rev. 06/99) Part A.—Liability coverage at 1.

An "insured" is defined, in pertinent part, as follows:

" 'Insured' as used in this part means:

"(1) You or any 'family member' for the ownership, maintenance or use of any auto or 'trailer.'

"(2) Any person using 'your covered auto.' " PNI policy, form PP 00 01 06 98, Part A.—Liability coverage at 2.

The PNI policy defines "family member" as "a person related to you by blood, marriage or adoption who is a resident of your household." PNI policy, form PP 00 01 06 98 definitions F. at page 1. Thus, the PNI policy provides coverage for Peter Sukeena, his "family members" and also for anyone using Peter Sukeena's 2002 Acura, which is a covered vehicle under the PNI policy.

However, the PNI policy excludes coverage for any "insured" "[u]sing a vehicle without permission of the owner." PNI policy, form 70-3408 (Rev. 06/99) Part A.— Liability coverage, exclusions A.8 at 1. Thus, Drozdowski is only insured if he was using Peter Sukeena's 2002 Acura with Peter Sukeena's permission. The evidence shows, however, that Drozdowski had neither express nor implied permission from Peter Sukeena to use the Acura. Accordingly, under the clear and unambiguous language of the PNI policy, Drozdowski is not entitled to coverage for Hanna's and Standard Fire's claims.

## II. *Permission To Use the Vehicle*

Pennsylvania law permits recovery under an insurance policy with a "non-permissive use" provision if it is possible to establish either express or implied permission to use the vehicle. *Nationwide Mutual Insurance Co. v. Cummings,* 438 Pa. Super. 586, 599, 652 A.2d 1338, 1344 (1994). A framework for analyzing whether an individual has implied permission to use a vehicle was set forth by the Superior Court in *Belas v. Nelanovich,* 247 Pa. Super. 313, 372 A.2d 478 (1977). In order to establish whether a party has implied permission:

"[T]he critical question will always be whether the named insured said or did something that warranted the belief that the ensuing use was with [its] consent. There must be 'a connection made' with the named insured's own conduct; proof of 'acts, circumstances and facts such as the continued use of the car,' will be insufficient 'unless they attach themselves in some way to the acts' of the named insured." *Id.,* 247 Pa. Super. at 324, 372 A.2d at 486.

Thus, there must be a nexus between the acts and the voluntary action on the part of the named insured in order for implied consent to exist. Determining whether a sufficient nexus exists is a factual question involving an analysis of the initial grant of permission to determine whether it was broad enough to include an implied grant to the permittee to give another use of the automobile. *Belas,* 247 Pa. Super. at 321, 372 A.2d at 483.

### a. Stephen Did Not Have Permission To Let Drozdowski Drive the Car

Peter Sukeena gave permission to Stephen Sukeena to use his car. But there is no evidence that Peter Sukeena expressly authorized anyone other than Stephen to drive the car, or that Peter gave permission to Stephen to let others drive the car. Peter testified that he and Stephen had never discussed letting others drive the car, and, moreover, that had they discussed it he would not have given permission. (Stipulated facts at ¶31.) Therefore, there was no express permission by Peter Sukeena for Drozdowski to drive the car.

There is also no evidence that could support a finding of implied permission because Peter Sukeena did not do or say anything to Stephen that would have allowed him to conclude that letting Drozdowski drive the car was permissible. Peter was not in fact aware that Stephen had ever let anyone else drive his car. (Stipulated facts at ¶31.) The fact that Peter and Stephen never discussed whether Stephen was authorized to in turn loan the car to another is insufficient to establish that permission because permission requires something more than mere sufferance or tolerance without taking steps to prevent use of the automobile, and permission cannot be implied

from possession and use of the automobile without the knowledge of the named insured. *Federal Kemper Ins. Co. v. Neary,* 366 Pa. Super. 135, 530 A.2d 929 (1987). Therefore, Drozdowski did not have the implied permission of Peter Sukeena to operate the car.

The evidence demonstrates that Stephen was not authorized, expressly or impliedly, to give permission to Drozdowski to drive the car. Therefore, whether it was Drozdowski who was driving the car at the time of the accident or a third person to whom Drozdowski had loaned the vehicle, Drozdowski is not entitled to coverage.

### 4. CONCLUSION

Therefore, because Edward Drozdowski was using the vehicle without the permission of its owner, regardless of whether Drozdowski or some other person whom he might have allowed to drive the car at the time of the motor vehicle accident was driving, Drozdowski is not entitled to coverage under the insurance policy issued by Penn National to Peter Sukeena.

### ORDER

And now, October 28, 2005, upon consideration of the complaint for declaratory judgment filed on October 1, 2004, and after submission of stipulated facts and argument; it is hereby ordered that the relief requested is granted and declaratory judgment is entered in favor of plaintiff Pennsylvania National Mutual Casualty Insurance Company and against defendants Edward Drozdowski, Sharon Hanna, Standard Fire Insurance Company, Joseph Hanna, Pauline Hanna and John Doe 1 a/k/a "Q."